# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **GREGORY  RABB,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **NO. 1:12-CV-02666-AJB** |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| ***Acting Commissioner of Social*** | : | |
| ***Security Administration,*** | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R   A N D   O P I N I O N[1]

Plaintiff Gregory Rabb ("Plaintiff") brought this action pursuant to

sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g),

1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the

Social Security Administration ("the Commissioner") denying his application for

Supplemental Security Income Benefits ("SSI") under the Social Security Act.[2] For the

---

[1]      The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  [*See* Dkt. Entries dated Apr. 9 & 10, 2013].  Therefore, this Order constitutes a final Order of the Court.

[2]      Title II of the Social Security Act provides for federal Disability Insurance Benefits ("DIB").  42 U.S.C. § 401 *et seq.*  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for Supplemental Security Income Benefits for the disabled.  Title XVI claims are not tied to the attainment of a particular period of

reasons below, the undersigned **REVERSES** the final decision of the Commissioner

**AND REMANDS** the case to the Commissioner for further proceedings consistent with

this opinion.

## I.    PROCEDURAL HISTORY

Plaintiff previously received SSI payments based on childhood disability, with

a disability onset date of July 1, 1997. [Record (hereinafter "R") R26]. After Plaintiff

turned eighteen years old on February 26, 2008, the Social Security Administration

("SSA") sought redetermination of his eligibility for continuing SSI benefits pursuant

to 42 U.S.C. § 1382c(a)(3)(H)(iii). [R71-77]. On May 8, 2009, the SSA issued a

decision indicating that Plaintiff was no longer disabled as of May 1, 2009, and it

ceased his benefits. [R32-34]. After the SSA denied Plaintiff's requests for

reconsideration, [R27-28, 35-36, 53-55], he requested a hearing before an

---

insurance disability. *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).
Otherwise, the relevant law and regulations governing the determination of disability
under a claim for DIB are nearly identical to those governing the determination under
a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005)
(citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).   In general, the
legal standards to be applied are the same regardless of whether a claimant seeks DIB,
to establish a "period of disability," or to recover SSI, although different statutes and
regulations apply to each type of claim. *See* 42 U.S.C. § 1383(c)(3) (establishing that
the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI).
Therefore, to the extent that the Court cites to DIB cases, statutes, or regulations, they
are equally applicable to Plaintiff's SSI claims.

Administrative Law Judge ("ALJ"), [R58].  An evidentiary hearing was held before the ALJ on October 3, 2011.  [R363-89].  The ALJ issued a decision on October 27, 2011, denying Plaintiff's application on the ground that his disability ended on May 1, 2009, and he had not become disabled again since that date.  [R16-24].  Plaintiff then requested review by the Appeals Council.  [R11].  On April 27, 2012, the Appeals Council denied the request, thereby making the ALJ's decision the final decision of the Commissioner.  [R7-9].

Plaintiff then filed this action in this Court on August 3, 2012, seeking review of the Commissioner's decision.  [Doc. 4].  The answer and transcript were filed on December 10, 2012.  [*See* Docs. 8, 9].  Plaintiff filed a brief in support of his petition on January 10, 2013, [Doc. 13], and the Commissioner filed a response in support of the decision on February 19, 2013, [Doc. 16].  On March 1, 2013, the Commissioner filed a more legible copy of the ALJ's decision, [Doc. 18], and on March 5, 2013, Plaintiff filed his reply brief in support of his petition for review, [Doc. 19].  The matter is now before the undersigned upon the administrative record, the parties' pleadings, and the briefs, and it is ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[3]

---

[3]   Plaintiff waived oral argument.  [Doc. 23].

3

## II.    STATEMENT OF FACTS

### A.    *Administrative Records*

Plaintiff's guardian, Theresa Hazard,[4] completed a Disability Report Adult form on Plaintiff's behalf on July 10, 2009. [R86-95]. She advised that Plaintiff's attention deficit disorder, seizure disorder, thoracolumbar[5] scoliosis, asthma, and other "multiple ongoing" medical problems limited Plaintiff's ability to work. [R87]. Ms. Hazard further informed the SSA that Plaintiff's back pain affected his ability to stand or sit for long periods of time. [*Id.*]. She reported that Plaintiff had been prescribed multiple medications for his impairments, including Neurontin for seizure disorder, loratadine for sinus problems, albuterol for asthma, Feosol for anemia, Concerta for attention deficit hyperactivity disorder ("ADHD"),[6] and epinephrine for an allergy to black ink.

---

[4]    Ms. Hazard is described in the record as Plaintiff's guardian and as his mother. The Court also uses these terms interchangeably in referring to Ms. Hazard.

[5]    "Thoracolumbar" refers to the portion of the vertebral column between the neck and pelvis. *See PDR Med. Dictionary* 998 (lumbar), 1806 (thoracolumbar, thorax) (1st ed. 1995).

[6]    Symptoms of ADHD include: problems focusing, difficulty staying focused and paying attention, hyperactivity, and difficulty controlling behavior. Nat'l Inst. of Mental Health, Attention Deficit Hyperactivity Disorder, http://www.nimh.nih.gov/health/publications/attention-deficit-hyperactivity-disorder/what-is-attention-deficit-hyperactivity-disorder.shtml (last visited 3/22/14).

4

[R92].  Ms. Hazard wrote that she has been Plaintiff's primary caregiver since he was four months old and that she did not receive financial assistance from either of his biological parents.  [R94-95].

On July 16, 2009, Ms. Hazard completed a Disability Report-Appeal. [R96-103; *see also* R132-39[7]].  She advised that Plaintiff suffered from severe scoliosis-related back pain that prevented him from standing or sitting for long periods and that Plaintiff's doctor had recently referred him for an evaluation with Dr. Neil Berry for his scoliosis.  [R96-97].  She also listed the same medications that were in the July 10, 2009, disability report.  [R99].  Ms. Hazard reported that Plaintiff had difficulty putting on his shoes due to back pain.  [R100].  She emphasized that Plaintiff could not work due to his learning disability, scoliosis pain, standing and sitting limitations, seizure disorder, and asthma.  [R102].  Ms. Hazard stated the she was on

---

[7]   With the exception of one page, [R139], which is an additional handwritten statement that is unsigned and undated, pages 132 to 138 of the record are almost identical to pages 96 to 103.  It appears that a field office representative typed Plaintiff's handwritten statements, and the only differences are minor typographical errors. Therefore, although page 139 of the record is undated, it is presumed that it is part of the report that was completed on July 16, 2009.  The undersigned will cite to the handwritten pages and will omit any cross-references to pages 132 to 138.

AO 72A
(Rev.8/8
2)

a fixed income of $718 per month and was having difficulty paying for Plaintiff's medications since he did not have medical insurance.  [R139].

Ms. Hazard provided a Function Report-Adult on Plaintiff's behalf on October 28, 2009.  [R107-114].  She stated that Plaintiff complained of chronic pain in his upper and lower back that affected his ability to stand and bend.  [R108].  She reported that he had difficulty with personal care, requiring her assistance with caring for his hair, tying his shoes, and shaving.  [*Id.*].  She indicated that he "sometimes" needs reminders to care for his personal needs and requires a written reminder to take his medications.  [R109].  She also reported that he has difficulty reading and is unable to cook because he cannot read the instructions and has chronic back pain.  [*Id.*].  Ms. Hazard indicated that Plaintiff is unable to go out in public alone but regularly goes with his family to various places, including church, sporting events, relatives' homes, and the library.  [R110-11].  She reported that he shops with her assistance and has problems handling money.  [R110].  She also stated that Plaintiff is sometimes unable to get out of bed due to back pain, and he can only walk ten feet before having to stop and rest.  [R112].  She indicated that he has difficulty understanding and following directions, both written and verbal, due to attention deficit disorder and dyslexia.  [R112].  Ms. Hazard also wrote that Plaintiff briefly did well in school when he was

6

transferred to a small-setting classroom with only nine students but that his grades dropped considerably when he moved to Georgia and was no longer in a small-setting classroom.  [R114].

On March 23, 2011, Plaintiff completed a second Disability Report-Appeal. [R150-57; *see also* R127-31[8]].  Plaintiff reported that his condition had changed since February 1, 2011, and that he was having seizures and difficulty sitting for long periods of time due to back pain.  [R150].  He further stated that since February 1, 2011, he had been depressed, had mood swings, tended to stay to himself, and was not going out as much.  [R150, 155].  Plaintiff indicated that he had also been having problems focusing, paying attention, and concentrating on tasks since that date.  [R151].  Plaintiff reported taking paroxetine[9] and trazodone[10] for depression and bipolar disorder but denied

---

[8]      Similar to the report completed on July 16, 2009, it appears that Plaintiff's statements were duplicated almost verbatim in a second form.  Therefore, the record at pages 127 to 131 is virtually identical to the record at pages 150 to 157.  For the sake of simplicity, the undersigned will cite to the record at pages 150 to 157.

[9]      Paroxetine, also known by the brand name Paxil, is a selective serotonin uptake inhibitor ("SSRI") used to treat depression, panic disorder, and social-anxiety disorder.  MedlinePlus, Paroxetine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html (last visited 3/22/14).

[10]      Trazodone is a serotonin modulator used to treat depression. MedlinePlus, Trazodone,  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last

7

experiencing any side effects from the medications.  [R153].  He stated that he had racing thoughts and trouble staying asleep and that the pain in his back caused him to have difficulty bending over.  [R154].

### B.   Medical and School Records

The earliest medical record presently before the Court is from an examination that took place at Kids Avenue Pediatrics on April 17, 2007.  [R248].  It was noted that Plaintiff had recently relocated to Georgia from Boston.  [R248].  Plaintiff reported that he misplaced his Ritalin prescription during his move from Boston, and Dr. Cheryl Richmond provided a replacement prescription and also diagnosed ADHD.  [*Id.*].

Plaintiff returned to Kids Avenue Pediatrics on June 15, 2007, with complaints that he was getting a hump in his back.  [R247].  Dr. Gertrude Arrington noted back kyphosis[11] with curvature and referred him to an orthopedist.  [*Id.*].  Plaintiff had a thoracolumbar x-ray on June 21, 2007, that revealed a five-degree rotational curvature

---

visited 3/22/14).

[11]    "Kyphosis is a curving of the spine that causes a bowing or rounding of the back, which leads to a hunchback or slouching posture."  MedlinePlus, Kyphosis, http://www.nlm.nih.gov/medlineplus/ency/article/001240.htm (last visited 3/22/14). Symptoms of kyphosis may include fatigue, mild back pain, round back appearance, tenderness and stiffness in the spine, and, in severe cases, difficulty breathing.  *Id.*

8

to the left and a spina bifida[12] at L5.  [R246].  It was also noted that the findings were suspicious for leg-length discrepancy.  [R246].

On October 26, 2007, Plaintiff presented to the emergency room at Southern Regional Medical Center complaining of "head injury, assault." [R231].  A cranial CT revealed mild ethmoid sinus disease, [R229], and a CT of the facial bones demonstrated no acute fracture, [R229-230].  Plaintiff was diagnosed with head contusions and given discharge instructions to take over-the-counter pain relievers.  [R232].

Plaintiff was examined at Kids Avenue Pediatrics on November 13, 2007. [R243].  A review of systems revealed that Plaintiff was "doing well in school, asthma stable." [*Id.*].   Dr. Arrington indicated that Plaintiff's examination was normal regarding his extremities, gait, reflexes, coordination, and neurological status but noted that he had back kyphosis. [*Id.*].  She diagnosed ADHD and kyphosis and prescribed Concerta. [*Id.*].

On December 10, 2007, Plaintiff saw Dr. Neil Berry with Eagle's Landing Bone and Joint upon Dr. Arrington's referral for evaluation of "a hump in his back." [R245].

_____

[12]    A spina bifida is an "embryologic failure of fusion of one or more vertebral arches." *PDR Med. Dictionary* 1649 (1st ed. 1995).

Upon examination, Dr. Berry noted thoracic kyphosis with lumbar lordosis[13] and a moderate amount of rotatory deformity.  [*Id*.].  He further indicated that Plaintiff's leg lengths were equal.   [*Id*.].   Dr. Berry reviewed x-rays that were provided by Dr. Arrington's office and noted that they revealed "rotator deformity of the lumbar spine, consistent with thoracolumbar scoliosis." [*Id*.].  He diagnosed thoracic kyphosis and lumbar lordosis.  [*Id*.].  Dr. Berry opined that because Plaintiff was skeletally mature, the degree of deformity should remain stable and no treatment was indicated. [*Id*.].

On May 13, 2008, Dr. Arrington provided a referral to a psychiatrist.  [R239]. Plaintiff returned to Dr. Arrington at Kids Avenue Pediatrics on August 6, 2008, at which time he requested a new referral to a psychologist or psychiatrist.  [R234]. Dr. Arrington diagnosed ADHD, conduct disorder, and seizure disorder.  [*Id*.].  She also prescribed refills of Plaintiff's Concerta.  [*Id*.].

On August 15, 2008, at the request of Plaintiff's school district, Jacqueline Scales, M.Ed., Ed.S., conducted a psychoeducational evaluation of Plaintiff. [R158-76].   Ms. Scales stated, "During [Plaintiff's] educational career, he has

---

[13]     "Lordosis is an increased curving of the spine."  MedlinePlus, Lordosis, http://www.nlm.nih.gov/medlineplus/ency/article/003278.htm (last visited 3/22/14).

10

evidenced significant emotional-behavioral and cognitive difficulties in various settings, beginning as early as elementary school," and that an evaluation conducted in June 2006 had indicated that Plaintiff's academic progress could be hindered by "behaviors of concern[] such as withdrawal, anxiety, and depression." [R159-60]. She further indicated that Plaintiff had thirty-one absences during the prior academic year and six behavioral referrals since entering Clayton County Schools during second semester. [*Id.*]. These behavioral referrals included two reprimands for using profanity towards school personnel, each resulting in out-of-school suspension for two days; one reprimand for using profanity, resulting in in-school suspension; one reprimand for using/possessing tobacco, resulting in in-school suspension; one reprimand for truancy, resulting in in-school suspension; and one reprimand for leaving the building without permission, resulting in in-school suspension. [R164].

Ms. Scales administered the Wechsler Adult Intelligence Scale - Third Edition and reported the following results: verbal IQ of 86 (below average), performance IQ of 81 (below average), and full scale IQ of 83 (below average). [R172]. Ms. Scales further reported below-average verbal comprehension, perceptual organization, and working speed as well as borderline processing speed. [*Id.*].

11

Ms. Scales noted that during her evaluation, Plaintiff "was not consistently focused on aspects of the testing process and frequently displayed behaviors associated with his ADHD diagnosis." [R160-61]. She also observed that "[s]everal breaks and frequent redirection to tasks were required in an attempt to optimize [his] performance due to his fluctuating levels of attention/concentration, distractibility, and overactivity," [R161]; he "demonstrated difficulties on a task assessing visual attention [and] concentration," [R162]; his long-term memory was weak, [R162]; he "experience[d] significant difficulties with mathematical calculation skills," [R163]; and his writing displayed "significant errors in applying rules, grammar, capitalization, and punctuation," [R164].

Ms. Scales opined that in the classroom, Plaintiff would "likely experience difficulty reading and answering questions about a passage, performing mathematical operations involving basic math facts, . . . completing tasks requiring him to convey his ideas in writing, and performing oral language tasks." [R169]. Ms. Scales determined that Plaintiff was "exhibiting characteristics associated with his medical diagnosis of ADHD" and that he "appears to be a student who is unable to maintain focus and attention in the classroom, and whose manner of coping with and expressing his feelings is inappropriate and interferes with classroom functioning, interpersonal

AO 72A
(Rev.8/8
2)

relationships, and social-emotional development." [R170]. She also opined that Plaintiff had "marked interpersonal difficulties" and that he "may require 3 to 5 times as much repetition of content as necessary for the average student." [R171].

Plaintiff again visited Dr. Richmond at Kids Avenue Pediatrics on February 21, 2009. [R302]. Dr. Richmond noted that a review of systems was negative, and Plaintiff reported doing well. [*Id.*]. The examination was normal throughout. [*Id.*].

On March 31, 2009, Robert Koontz, Ph.D., completed a Psychological Review Technique Form ("PRTF"), [R276-89], and a Mental Residual Functional Capacity Assessment ("MRFC"), [R272-75]. In the PRTF, Dr. Koontz opined that Plaintiff had several medically-determinable impairments, including organic mental disorders, personality disorders, ADHD, written and language learning disorders, and disruptive behavior disorder. [R276-77, 283]. He indicated that Plaintiff would have moderate "restriction of activities of daily living," moderate "difficulties in maintaining social functioning," and moderate "difficulties in maintaining concentration, persistence, or pace." [R286]. He opined that Plaintiff would not have any episodes of decompensation. [*Id.*]. Dr. Koontz found that Plaintiff had a "long [history] of peculiar [behavior] wherein [Plaintiff] seeks negative attention, skips classes, doesn't apply

13

himself but is not really a classic [emotional-behavioral disorder] student [regarding] being aggressive or overtly oppositional . . . ." [R288].  Dr. Koontz found that Plaintiff was "fully credible" regarding his ADHD and learning disorders.  [*Id.*].  Furthermore, he gave "substantial weight" to the psychoeducational evaluation performed by Ms. Scales.  [*Id.*].

In the MRFC, Dr. Koontz opined that Plaintiff would have moderate difficulty in the following categories: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; performing work within a schedule, regularly attending work, and being punctual; completing a normal workday or work week without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers; and responding appropriately to changes in the work setting.  [R272-73].  He further found that Plaintiff did not have significant restrictions in his ability to perform in the following categories: remembering locations and work-like procedures; understanding and remembering very short and simple instructions; carrying out very short and simple instructions; sustaining an ordinary

14

routine without specific supervision; making simple work-related decisions; asking simple questions or requesting assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of normal workplace hazards and taking proper precautions; traveling to unfamiliar places and using public transportation; setting realistic goals; and making plans independently of others. [*Id.*]. He noted that Plaintiff would have episodic difficulty with the public, co-workers, supervisors, and bosses; some initial difficulty with workplace adaptation, especially with quick changes; and some difficulty with detailed instructions, sustaining concentration for complex or unfamiliar tasks, and performing at a consistent pace and within a schedule. [R274-75]. He also opined that none of the limitations were substantial. [*Id.*].

On April 29, 2009, Oluropo Ayeni, M.D., performed a consultative examination at the request of Disability Adjudication Services. [R290-92]. Plaintiff complained of seizures, attention deficit disorder, a hump in his back, sinus problems, and asthma. [R290]. Plaintiff indicated that he had not had a seizure since his medication was changed in 2004, that he had pain in his upper and middle back, which was aggravated by physical activity and prolonged standing, and that he was under treatment for asthma and had not had an attack in more than a year. [*Id.*]. Examination findings were

15

significant for the following: normal chest exam with good air exchange and no wheezing; sensation diminished to fine touch in L4 and L5; point tenderness at T7-T9; hump in the upper back; no scoliosis; normal flexion, extension, and straight-leg raises; normal and steady gait without a limp or use of an assistive device; good peripheral pulses; no muscle atrophy or tremors; normal coordination and grip strength; and normal joints in the extremities. [R291-92]. Dr. Ayeni diagnosed seizure disorder, well controlled on current medications; asthma, fairly stable; history of ADHD; and "[c]hronic back pain—patient noted with marked kyphosis of the spine." [R292].

On May 8, 2009, Patricia Schiff, M.D., completed a Physical Residual Functional Capacity Assessment ("PRFC"). [R293-300]. Dr. Schiff based her assessment on Plaintiff's seizures, asthma, and kyphosis of the spine. [R293]. She found that Plaintiff maintained the capacity to lift fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; push and/or pull with unlimited frequency; and frequently climb ramps and stairs, balance, stoop, crouch, kneel, and crawl; but that he could not climb ropes, ladders, or scaffolds. [R294-95]. Dr. Schiff indicated that due to asthma and seizure precautions, Plaintiff should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation, and should avoid all exposure to

16

hazards such as machinery and heights. [R297]. Dr. Schiff indicated that "some degree of back pain is credible but would not preclude RFC at this level." [R298].

Plaintiff returned to Kids Avenue Pediatrics on July 1, 2009, complaining of a severe hump in his back, nasal congestion, and cough. [R301]. Dr. Arrington diagnosed kyphosis, scoliosis, and clinical rhinitis, ordered an x-ray, and referred Plaintiff to Dr. Berry for follow-up. [*Id.*].

Plaintiff saw Dr. Berry on July 9, 2009. [R309-10]. Dr. Berry stated that Plaintiff had "some ongoing intermittent pain, for which he takes Motrin." [R310]. Dr. Berry observed that Plaintiff stood with "very poor posture with increased lumbar lordosis and thoracic kyphosis, which [Plaintiff] can correct to approximately 50%, when trying to stand up straight." [*Id.*]. Dr. Berry further noted that Plaintiff had around twenty-five to thirty degrees of fixed thoracic kyphosis. [*Id.*]. X-rays of the lumbar and thoracic spins were unremarkable, except for a spina bifida. [*Id.*]. Dr. Berry's assessment was "thoracic scoliosis mildly symptomatic." [R309]. He "suggested Motrin for symptomatic treatment." [*Id.*].

On November 4, 2009, Eva Harris, M.D., a state agency reviewing physician, completed a PRFC. [R312-19]. Her assessment was based on Plaintiff's seizures, asthma, and kyphosis. [R312]. Dr. Harris found that Plaintiff was capable of lifting

fifty pounds occasionally and twenty-five pounds frequently; standing and/or walking about six hours in an eight-hour workday; sitting about six hours in an eight-hour workday; pushing and pulling with unlimited frequency; climbing ramps and stairs frequently; and frequently stooping, crouching, kneeling, crawling, and balancing; but that he was not capable of climbing ladders, ropes, or scaffolds.  [R313-14].  Dr. Harris further indicated that due to his history of asthma and seizures, Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation and should avoid all exposure to hazards, such as machinery and heights.  [R316].

On December 2, 2009, Janet Telford-Tyler, Ph.D., a state agency reviewing psychologist, completed a PRTF, [R320-33], and an MRFC, [R334-37].  Dr. Telford-Tyler noted that Plaintiff had organic mental disorders, personality disorders, and diagnoses of ADHD, learning disorder, and conduct disorder. [R320-21, 327].  She opined that Plaintiff had moderate restriction in the areas of activities of daily living; maintaining social functioning; and maintaining concentration, persistence, and pace.  [R330].  She also found no limitation in the area of extended episodes of decompensation.  [*Id.*].  She found that the function report completed by Plaintiff's parents was "generally credible."  [R332].

18

In the MRFC, Dr. Telford-Tyler opined that Plaintiff was moderately limited in his ability to perform in the following areas: understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; maintaining regular attendance; being punctual; sustaining an ordinary routine without special supervision; completing a normal workday and work week without interruption from psychological symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; and getting along with coworkers.  [R334-35].  Dr. Telford-Tyler found that Plaintiff was not significantly limited in his ability to perform in the following areas: remembering locations and work-like procedures; understanding, remembering, and carrying out very short and simple instructions; working in coordination with or proximity to others without being distracted; making simple work-related decisions; asking simple questions or requesting assistance; accepting instructions or criticism from supervisors; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; being aware of normal workplace hazards and taking appropriate precautions; traveling in unfamiliar locations or using public transportation; and setting realistic goals or making plans independently

19

of others.  [*Id.*].  More specifically, Dr. Telford-Tyler made the following assessments: Plaintiff was capable of understanding and remembering simple tasks but would have difficulty with detailed tasks; Plaintiff was capable of maintaining attention, concentration, and pace for simple tasks but would have difficulty with detailed tasks and sustained concentration; Plaintiff's psychological symptoms may interfere with a normal workweek, and Plaintiff may require some initial extra supervision; Plaintiff may have difficulty dealing with the public and responding appropriately to co-workers; and Plaintiff's adaptation skills appeared to intact.  [R336].  She further opined that Plaintiff was not significantly limited in any of the areas.  [*Id.*].

On November 22, 2010, Plaintiff sought mental health treatment through Clayton Center Community Service Board ("Clayton Center").  [R341].  He presented with "a history of ADHD and complaints of depressed mood, angry outbursts, crying spells, paranoia, and sleep disturbance/problems focusing."  [*Id.*].  Dr. Deen Chandora and Brenda Stinson, M.Ed., L.P.C., initially evaluated Plaintiff. [*Id.*].  They noted "guarded and dependent behavior, flat affect, [and] sad mood" without "report or evidence of perceptual disturbance."  [R350].  Plaintiff was diagnosed with major depressive

20

disorder recurrent, mild, and "attention deficit" and was assigned a Global Assessment of Functioning ("GAF") score of 60.[14]  [R349-50].

Dr. Chandora re-evaluated Plaintiff eight days later, on November 30, 2010. [R355].  Dr. Chandora noted that Plaintiff's behavior was remarkable in that he was "unable to sit without fidgeting."  [*Id.*].  Otherwise, the evaluation was unremarkable as to affect, mood, thought process, and orientation.  [*Id.*].  Dr. Chandora confirmed Plaintiff's prior diagnosis of major depressive disorder; noted that he had support and vocational problems; assigned a GAF score of 30[15]; and prescribed Paxil and trazodone, [R352, 355].

Plaintiff was also evaluated that day by Lynettea Washington, RN.  [R356-58]. Plaintiff indicated that his last dose of Concerta was June 2009, [R357], and

---

[14]     The GAF is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR").  A GAF score between 51 and 60 signifies "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.* at 34.

[15]     A GAF score between 21 and 30 signifies "[b]ehavior [that] is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).  DSM-IV-TR at 34.

21

Nurse Washington provided a list of community resources for medical and prescription assistance, [R358].

Plaintiff returned to Dr. Chandora on March 24, 2011. [R352-53]. Dr. Chandora indicated that Plaintiff's affect was guarded and his mood was down. [R353]. Dr. Chandora diagnosed Bipolar I Disorder, Most Recent Episode Depressed, Severe Without Psychotic Features; indicated that Schizoaffective Disorder was possible; noted that Plaintiff had support, vocational, and living-condition problems; and assigned a GAF score of 30. [R353]. Dr. Chandora added Depakote[16] to Plaintiff's prescriptions as a mood stabilizer. [R352-53].

Juliette McGaha, RN, also evaluated Plaintiff on March 24, 2011. [R354]. Plaintiff reported that he was out of medication because he did not have insurance and that had missed an appointment with the doctor due to car problems. [*Id.*]. Nurse McGaha provided Plaintiff with a list of "free and low cost medical providers." [*Id.*]. Plaintiff complained of mood swings occurring several times a week and paranoia "at times." [*Id.*].

---

[16]    Depakote is a brand name for valproic acid, which is used to treat seizures, manic episodes in individuals with bipolar disorder, and migraine headaches. Medline Plus, Valproic Acid, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html#brand-name-1 (last visited 3/24/14).

AO 72A
(Rev.8/8
2)

### C.      *Evidentiary Hearing Testimony Before the ALJ*

### 1.      *Plaintiff*

Plaintiff testified that he was 6'4" tall and weighed 270 pounds.  [R368].  He lived with his mother and had never been married.  [*Id.*].  He dropped out of high school in the tenth grade because it was too difficult for him.  [R368-69].  Plaintiff had never been employed and relied on his mother for support since he was no longer receiving SSI benefits.  [R369].

Plaintiff testified that he had been enrolled in GED classes for two months and attended two-and-one-half hours of class twice a week.  [R369].  He reported that he found the classes "difficult" and that he particularly had difficulty with reading.  [R370].  When asked about paying attention in these classes, Plaintiff testified that he "just joke[s] around because [he doesn't] understand what [the class is] doing." [R372]. Plaintiff stated that his mother had to assist him with reading his mail and completing forms.  [R370].  Plaintiff indicated that his ability to perform simple math, such as adding and subtracting, was "decent" but that he had difficulty with long multiplication or division.  [*Id.*].  Plaintiff testified that he can count money but that he does not shop alone because he has short-term memory problems.  [R370-71].  He further stated that

he had never possessed a driver's license or driving permit because he failed the written portion of the driving test. [R371].

Plaintiff testified that he had never lived alone. [R371]. He reported that he can make some meals, such as omelets and burgers, but is unable to prepare meals with multiple ingredients. [R372]. Plaintiff indicated that he has difficulty sleeping and typically falls asleep around 7:00 a.m. and wakes around 3:00 p.m. [*Id.*]. Plaintiff testified that he was prescribed medication to help him sleep but that it stopped working. [R373]. Plaintiff indicated that he may remain in bed for several hours due to back pain. [*Id.*]. Plaintiff testified that he is capable of watching a two-hour movie if it is an action movie but that he gets distracted during movies with a plot, and he also testified that he watches things like cartoons and Charlie's Angels on television. [R373-74]. Plaintiff testified that he has friends but does not socialize with them often because he does not want to get out of bed due to his depression. [R374]. He reported that he spends his weekends watching television and sitting around the house. [*Id.*]. Plaintiff tries to wash dishes but reported that his mother does not like the way that he washes them. [*Id.*]. Plaintiff tried to do his laundry once but spilled bleach everywhere. [R375].

Plaintiff testified that he had back pain and had been taking Motrin but that he was not currently taking any pain medication for his back. [R375]. He said that he had seen a doctor for his back when he was eighteen years old but was told that because he had "turned the legal age," he could not get surgery. [*Id.*]. Plaintiff stated that because of his back pain, he could sit for twenty minutes before having to stand up and could stand for thirty minutes at the most. [*Id.*]. Plaintiff indicated that he might be able to lift as much as twenty pounds but not twenty-five pounds. [R375-76]. He stated that he could bend over to pick something up but would have pain upon rising. [R376].

Plaintiff stated that his asthma causes him to have difficulty climbing stairs. [*Id.*]. Plaintiff testified that doing things too fast or going to sleep hot will elicit asthma symptoms, such as gasping and wheezing. [*Id.*]. He stated that he had not been on asthma medication since before summertime because he could not afford it. [R376-77].

Plaintiff testified that he was taking medication for depression and that the medication caused him to have an increased appetite and weight gain. [R377]. Plaintiff reported that his weight had increased from 190 pounds to 270 pounds. [*Id.*]. Plaintiff stated that he had mood swings and that when he did, he would get angry and aggravated quickly and would argue with people. [R378]. He also indicated that he was able to interact well with others when he was in a good mood. [*Id.*]. Plaintiff

25

reported that his medications prevented him from having a bad mood "for a little bit" and that the medications give him "enough time to focus." [R378-79].

Plaintiff stated that he had a seizure disorder. [R377]. He indicated that when he was having a seizure, he was unable to talk or move the left side of his body. [*Id.*]. Plaintiff reported that he had stopped taking his seizure medication two months prior to the hearing because he was unable to afford it. [*Id.*]. Plaintiff testified that when he was on his medication, he had "zero" seizure activity and that when he was off medication, he had episodes of seizure activity every couple of weeks. [R377-78]. He stated that by not taking the medication, he was "playing a dangerous game with [his] life." [R377].

Plaintiff testified that he could not work full time if offered a job because he "can't even stand up for too long" and "can't lift." [R379]. Plaintiff further indicated that he could not do a sit-down job because he would be "getting up every five minutes." [*Id.*]. Plaintiff stated that he had previously looked for work at McDonald's or warehouses before his back condition worsened but that he was told that with his reading disability and depression, he could not work. [*Id.*].

26

### 2.     *Plaintiff's Guardian*

Plaintiff's guardian, Ms. Hazard, also testified during the hearing.  [R380].
Ms. Hazard testified that Plaintiff had been in her custody since he was four months
old.  [R381].  She stated that Plaintiff had been in special education classes throughout
school.  [*Id.*].  She indicated that Plaintiff had very poor writing skills but was
improving; however, his reading ability had been stable over the last two years and was
still at a third-grade or fourth-grade level.  [*Id.*].  Ms. Hazard testified that Plaintiff was
able to read some mail but that if it was "too hard," he would bring it to her to read.
[*Id.*].  She further indicated that Plaintiff was doing poorly in his GED classes for
reading and language arts and that he was not ready to take the test yet.  [R382].

Ms. Hazard testified that Plaintiff needed assistance with his activities of daily
living, including laundry, making his bed, and cooking meals.  [R382-83].  She has to
monitor him while he is cooking to ensure that he does not burn the food.  [R383].  He
had damaged two microwave ovens trying to make popcorn.  [*Id.*].  Plaintiff could do
things like make a peanut butter and jelly sandwich, but it would be sloppy.  [*Id.*].

Ms. Hazard indicated that Plaintiff prefers to socialize with family members or
people that he knows well because he has issues with trust, but she indicated that he
does well in these types of social settings.  [*Id.*].  She indicated that he has two friends

27

AO 72A
(Rev.8/8
2)

that he frequently talks to on the phone.  [*Id.*].  She stated that Plaintiff used to attend some social activities, such as movies or bowling, but that these activities had been limited due to the family finances.  [R383-84].

Ms. Hazard stated that she provides transportation for Plaintiff and that he is unable to use public transportation on his own.  [R384].  She testified that he attempted to use public transportation one time in 2007 but got lost for several hours.  [*Id.*].

Ms. Hazard stated that Plaintiff wanted to manage his own medication but that he could not remember to take it on his own, even when she organized it for him in day-of-the-week compartments.  [*Id.*].  She stated that Plaintiff missed some medical appointments because they were temporarily living with a relative far on the opposite side of Atlanta from his doctors and she had transportation problems.  [R385].

Ms. Hazard testified that Plaintiff continues to have seizures approximately five times per month.  [R385].  She stated that he has seizures in his sleep and wakes up disoriented and has speech problems.  [*Id.*].  These symptoms last approximately an hour.  [*Id.*].  She testified that Plaintiff uses her asthma medication because they are prescribed the same medication and she cannot afford to buy him his own medication.  [R385-86].  Ms. Hazard indicated that Plaintiff's asthma flares in the summertime and that he used a nebulizer eight or nine times the previous summer.  [R386].

28

### 3. *Vocational Expert*

A vocational expert ("VE") also testified at Plaintiff's hearing. [R387]. The ALJ asked the VE whether work existed that could be performed by an individual of Plaintiff's age, education, and work history, and who is "functionally illiterate"; capable of light work; can never climb ladders, ropes or scaffolds; can only occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl; must avoid concentrated exposure to fumes, odors, dust, gasses and poor ventilation; must generally avoid workplace hazards; can understand, remember, and carry out simple instructions only; can have no more than casual contact with the public and up to occasional contact with coworkers; and cannot perform fast-paced production work. [R387]. In response, the VE testified that such a person could work as a nut sorter in the canning and preserves industry; a cleaner in housekeeping, light; or a folder in a commercial laundry. [R388]. The VE further testified that if the person's combination of medically determinable impairments and pain associated with those impairments also caused him to be unable to consistently maintain concentration and attention for two-hour periods of time, deal with work stress, or deal with changes in the work setting, the individual would not be able to work. [*Id.*].

AO 72A
(Rev.8/8
2)

### III.   ALJ'S FINDINGS

The ALJ made the following findings:

1.   The claimant attained age 18 on February 25, 2008, and was eligible for supplemental security income benefits as a child for the month preceding the month in which he attained age 18.  The claimant was notified that he was found no longer disabled as of May 1, 2009, based on a redetermination of disability under the rules for adults who file new applications.

2.   Since May 1, 2009, the claimant has had the following severe impairments: seizure disorder, asthma, lumbar lordosis and thoracic kyphosis, obesity, borderline intellectual functioning, learning disorder, and mild depressive disorder (20 CFR 416.920(c)).

     . . .

3.   Since May 1, 2009, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

     . . .

4.   [S]ince May 1, 2009, the claimant has had the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 416.967(b) except he can never climb ladders, ropes, or scaffolds, and can only occasionally climb ramps and stairs.  He can occasionally balance, stoop, kneel, crouch, or crawl.  He must avoid all workplace hazards, and must avoid concentrated exposure to fumes, odors, dusts,

AO 72A
(Rev.8/8
2)

gases, and poor ventilation due to his asthma. He can understand, remember, and carry out simple instructions only. The claimant can have casual contact with the public and occasional contact with co-workers. He is unable to perform fast-paced production work.

. . .

5.     The claimant has no past relevant work (20 CFR 416.965).

6.     The claimant was born on February 26, 1990 and is a younger individual age 18-49 (20 CFR 416.963).

7.     The claimant is illiterate and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.     Since May 1, 2009, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

. . .

10.    The claimant's disability ended on May 1, 2009, and the claimant has not become disabled again since that date (20 CFR 416.987(e) and 416.920(g)).

[R18-24].

31

The ALJ explained that Plaintiff's severe impairments could reasonably produce his alleged symptoms but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible because they were not supported by the medical record.  [R22].

First, the ALJ found that the record did not demonstrate that Plaintiff's physical symptoms were disabling.  [*Id.*].  He noted that Dr. Ayeni's examination was "within normal limits" and that Plaintiff had reported to Dr. Ayeni that he had not had a seizure since 2004 or an asthma attack in over a year.  [*Id.*].  The ALJ also noted that the record was devoid of any hospitalizations or emergency room visits for either asthma attacks or seizures.  [*Id.*].  The ALJ advised that he took Plaintiff's obesity into consideration when determining postural limitations for the RFC.  [*Id.*].

Second, the ALJ found that the record did not support a finding of disability based on Plaintiff's mental impairments.  [*Id.*].  The ALJ noted that Plaintiff's IQ scores were in the 80s, which classified him as "below average" rather than "borderline" and therefore did not support a finding of disability.  [*Id.*].  He further noted that Plaintiff had "very little specialized mental health treatment for depression," that Plaintiff did not seek specialized treatment from Clayton Center until November 2010, and that

32

Plaintiff's affect, mood, thought process, and behavior were cited as unremarkable during his March 2011 visit.  [*Id.*].

The ALJ further explained that he gave considerable weight to the opinions of state agency consultants Dr. Harris and Dr. Telford-Tyler in arriving at the RFC determination because although neither doctor examined Plaintiff, their opinions were consistent with the record as a whole and were supported by the medical records. [R23].  He also explained that he found, based on the testimony of the VE, that Plaintiff could "mak[e] a successful adjustment to other work that exists in significant numbers in the national economy," such as nut sorter, housekeeper-cleaner, or commercial laundry folder.  [R23-24].

## IV.    STANDARD FOR DETERMINING DISABILITY

Under the Social Security Act, an award of child's SSI must be redetermined when the child reaches age eighteen "by applying the criteria used in determining initial eligibility for individuals who are age 18 or older."  42 U.S.C. § 1382c(a)(3)(H)(iii); *see* 20 C.F.R. § 416.987.  The individual may be found not disabled as an adult even though he was previously found disabled as a child.  20 C.F.R. § 416.987(a)(2). Additionally, a showing of medical improvement is not required in redetermination cases.  20 C.F.R. § 416.987(b); *Clay v. Comm'r of Soc. Sec.*, No. 2:12-cv-0606-KJN,

33

AO 72A
(Rev.8/8
2)

2013 WL 1651950, at *3 n.4 (E.D. Cal. Apr. 16, 2013) (citing 20 C.F.R. § 416.987 and explaining that "the Commissioner uses the rules for adults who file new applications and not the rules for medical improvement review"); *see also Wells v. Comm'r of Soc. Sec.*, No. 6:09-cv-1669-Orl-28DAB, 2011 WL 722764, at *3 (M.D. Fla. Jan. 21, 2011) (relying on 42 U.S.C. § 1382c(a)(3)(H) to reach the same conclusion).

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing

AO 72A
(Rev.8/8
2)

the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).

In a typical adult case, the Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In evaluating a claimant's continuing disability after age eighteen, the ALJ follows a modified version of the five-step sequential evaluation process used for adult claimants. 20 C.F.R. §§ 416.920(c)-(h), 416.987(b). In such cases, the ALJ does not apply the step-one rule set forth in § 416.920(b) to determine whether the claimant is currently engaged in substantial gainful activity; however, he applies the second through fifth steps of the sequential evaluation process. 20 C.F.R. § 416.987(b). The claimant must prove at step two that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii),

AO 72A
(Rev.8/8
2)

416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  *Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superceded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

AO 72A
(Rev.8/8
2)

## V.      SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance."  *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as

37

AO 72A
(Rev.8/8
2)

a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Plaintiff alleges that:  (1) the ALJ's residual functional capacity determination is unsupported by substantial evidence; (2) the ALJ's credibility determination is unsupported by substantial evidence; and (3) these errors caused the hypothetical posed to the VE to be incomplete, and therefore the ALJ's determination that Plaintiff is

38

capable of adjusting to work is unsupported by substantial evidence.  [*See* Doc. 13].

The undersigned addresses each claim of error below.

### A.      *RFC Determination*

The RFC constitutes the most that an individual can still do after consideration of his physical and mental limitations and work restrictions.   *See* 20 C.F.R. § 404.1545(a)(1).   In determining the RFC, the ALJ evaluates all of the relevant medical and other evidence, including the claimant's descriptions of his limitations. 20 C.F.R. § 404.1454(a)(3); *see also* Social Security Ruling ("SSR") 96-8p.

Plaintiff argues that the ALJ's RFC is unsupported by substantial evidence because the ALJ failed to account for the fact that Dr. Chandora twice assigned Plaintiff a GAF score of 30 and also failed to reconcile the RFC with Dr. Telford-Tyler's opinion that Plaintiff may have episodic interruptions in a normal workweek and may require initial extra supervision. [Doc. 13 at 14-17].  The Court addresses each of these alleged errors below.

### 1.      *GAF Scores*

Plaintiff contends that the ALJ erred by failing to evaluate Dr. Chandora's opinion that Plaintiff's GAF score was at 30 on both November 30, 2010, and March 24, 2011, or to state the weight Dr. Chandora's opinion was afforded.

[Doc. 13 at 14-16].   He points out that Dr. Chandora was a treating physician, [*id*. at 14], and that a GAF score of 30 indicates behavior that is "considerably influenced by delusions or hallucinations or serious impairment in communication or judgment" or "inability to function in almost all areas," [*id*. at 15-16 (quoting DSM-IV-TR at 34)].   He suggests that Dr. Chandora's GAF findings constitute a treating source's medical opinion that Plaintiff's limitations were greater than those found by agency review physician Dr. Telford-Tyler or appearing in the RFC and that it was error for the ALJ simply to credit the reviewer's opinion without explaining what weight he gave Dr. Chandora's opinion.   [Doc. 13 at 14-16].

In response, the Commissioner contends that the absence of any discussion about the GAF scores was, at worst, harmless error.   [Doc. 16 at 7-10].   The Commissioner points out that because GAF scores reflect an examiner's opinion regarding a person's symptoms or possible difficulty in social, occupational, or school functioning at the time of the examination, a GAF score may have nothing to do with the person's ability to work, [*id*. at 9 (citing DMS-IV-TR at 32-34)], and the Commissioner also notes that the SSA has declined to endorse the use of GAF scores in disability determinations, [Doc. 16 at 8 (citing *Wind v. Barnhart*, 133 Fed. Appx. 684, 692 n.5 (11th Cir. June 2, 2005) (per curiam))].   The Commissioner therefore argues that "[a]bsent evidence that

40

an examiner assigned a GAF score based on his or her opinion regarding the patient's ability to work, a GAF score is not entitled to any weight," [Doc. 16 at 9-10]. The Commissioner also suggests that the GAF scores of 30 are unworthy of credence because Dr. Chandora had assigned a GAF of 60 only one week before he assigned a GAF of 30 on November 30, 2010; Dr. Chandora did not explain why he assigned Plaintiff a GAF score of 30 on November, 30, 2010, despite having found that Plaintiff's affect, mood, thought process, and orientation were unremarkable; Dr. Chandora did not explain why he assigned Plaintiff a GAF score of 30 on March 24, 2011, despite having found that Plaintiff's thought process and behavior were unremarkable and merely describing his affect as "guarded" and his mood as "down"; and it was noted during the March 24, 2011, visit that Plaintiff reported having been out of his medication for at least two weeks and had missed his last appointment due to car problems. [*Id.* at 8-10; *see also* R352-55].

In reply, Plaintiff argues that failure to evaluate a GAF score can constitute reversible error where the claimant has received repeatedly low GAF scores that indicate severe impairments. [Doc. 19 at 2]. He contends that here—where the assigned GAF is so low that it indicates behavior that is "considerably influenced by delusions or hallucinations," "serious impairment in communication or judgment," or

41

"inability to function in almost all areas," and where that number was assigned twice—disregard of the GAF scores constitutes such reversible error.  [*Id.*].

After careful consideration of the evidence, the Court concludes that the ALJ erred in failing to weigh Dr. Chandora's GAF-score opinions or to articulate any reasons for discrediting these opinions.  The Court acknowledges that the Commissioner has declined to endorse GAF scores as unequivocal evidence of work limitations.  *See Revised Med Criteria for Evaluating Mental Disorders and Traumatic Brain Injury,* 65 Fed. Reg. 50,764-65 (Aug. 21, 2000) (stating that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings"); *see also Wind*, 133 Fed. Appx. at 692 n. 5 (confirming that GAF scores do not equate to a finding of disability under the listings).  Moreover, the Commissioner is correct that courts have in many cases determined that unless a physician specifies that a GAF score is an assessment of the patient's ability to work, the score alone is not entitled to weight as evidence establishing work limitations.  *See, e.g., Kornecky v. Comm'r Soc. Sec.*, 167 Fed. Appx. 496, 511 (6th Cir. Feb. 6, 2006) (per curiam); *Berkel v. Colvin*, Civ. Action File No. 1:12-CV-03558-AJB, 2014 WL 806864, at *11 (N.D. Ga. Feb. 27, 2014) (Baverman, M.J.); *Quaite v. Barnhart*, 312 F. Supp. 2d 1195,1200 (E.D. Mo. 2004).

42

Nevertheless, where there is reason to believe that a GAF score reflects the physician's belief that the claimant suffers from limitations sufficiently severe to affect his ability to work, the ALJ's failure to adequately assess and weigh GAF-score opinions can constitute reversible error. *See McCloud v. Barnhart*, 166 Fed. Appx. 410, 418 (11th Cir. Jan. 25, 2006) (per curiam) ("With the knowledge that a GAF score of 45 reflects severe impairments, the ALJ should determine what, if any, weight to place on the score."). *Cf. Henry v. Astrue*, Civ. Action No. 5:11-cv-2267-AKK, 2012 WL 3854452, at *5 (N.D. Ala. Aug. 31, 2012) (finding that it is reversible error for an ALJ to ignore multiple low GAF scores that are indicative of severe impairments but holding that this case did not warrant reversal because the GAF scores increased from 40 to 57, which established that the impairment did not remain severe). The facts of this case present such a situation.

First, as Plaintiff points out, a GAF score of 30 connotes impairments so severe that they would almost unavoidably impact the person's ability to work. According to the DSM-IV, a GAF between 21 and 30 indicates: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or

43

friends)." DSM-IV-TR at 34.  Second, close reading of Dr. Chandora's treatment notes indicates that he did have concerns about Plaintiff's ability to work.  Indeed, on the treatment notes both for the visit taking place on November 30, 2010, and the visit taking place on March 24, 2011, Dr. Chandora noted vocational problems in the Axis IV diagnosis immediately preceding the GAF score, [R353, 355], and on November 30, 2010, Dr. Chandora expressly noted that Plaintiff had "never worked," [R355].  Additionally, while the Commissioner appears to suggest that the GAF of 30 is an outlier among otherwise normal findings, the notes in fact indicate that on November 30, 2010, Dr. Chandora found Plaintiff's behavior abnormally restless and fidgety, Plaintiff reported to him that he was unable to sleep, and Plaintiff's mother reported that he felt depressed and isolated himself, [R355], and that on March 24, 2011, Dr. Chandora diagnosed severe bipolar disorder, [R353].  Third, while the GAF score of 60 assigned on November 22, 2010, is certainly incongruent with the GAF of 30 assigned approximately a week later, it bears noting that the GAF score of 60 was assigned on the first day Plaintiff sought treatment with Dr. Chandora and therefore was generated before Dr. Chandora had established a treating history with Plaintiff that was sufficiently lengthy to allow Dr. Chandora to be considered a "treating" source.  [*See* R341-51].

44

Whether a treating physician's records support the physician's opinions goes to the weight of the opinions rather than whether the opinions should be weighed at all. *See Broughton v. Heckler*, 776 F.2d 960, 961-62 (11th Cir. 1985) (noting that a treating physician's opinion is entitled to considerable weight unless good cause exists for not crediting it); *Moore v. Astrue*, No. 5:08-cv-92 (CAR), 2009 WL 1025389, at *2 (M.D. Ga. Apr. 15, 2009) (finding that the ALJ did not commit an error when the ALJ fully detailed the reasons for discrediting a treating psychologist's medical opinion based on inconsistencies between the psychologist's own medical records and his medical opinions); *see also* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight [the Commissioner] will give to that opinion.").

Without an explanation regarding the weight given to medical opinions indicating limitations greater than those included in the hypothetical posed to the VE, the Court cannot properly evaluate whether substantial evidence supports the ALJ's decision that Plaintiff is not disabled and is able to adjust to other work. Hence, upon remand, the ALJ must weigh the GAF scores assigned by Dr. Chandora and either re-craft the RFC and hypothetical or explain why the opinions do not support a finding of greater mental limitations. *See McCloud*, 166 Fed. Appx. at 418 (remanding to allow

the ALJ to properly evaluate GAF-score opinions of 45 and 48).

### 2.    *Dr. Telford-Tyler's Opinion*

Next, Plaintiff argues that the ALJ failed to reconcile the RFC determination with Dr. Telford-Tyler's opinion. [Doc. 13 at 16]. Specifically, Plaintiff asserts that the ALJ erred when he stated that he gave Dr. Telford-Tyler's opinion "considerable weight," yet did not adopt Dr. Telford-Tyler's opinions that Plaintiff had the potential for episodic interruptions in a normal workweek due to his psychological symptoms and that Plaintiff may need initial extra supervision on the job or explain why he declined to adopt those portions of Dr. Telford-Tyler's opinion. [*Id.* at 16-17; *see also* R336]. Plaintiff alleges that the failure to either adopt the opinions or explain why they were not adopted constitutes reversible error. [Doc. 13 at 16-17].

In response, the Commissioner points out that although Dr. Telford-Tyler found that Plaintiff may have episodic interruptions in the workweek secondary to psychological symptoms and may need some initial extra supervision, she also stated that "[n]either [was] a substantial limitation." [Doc. 16 at 11 [citing R336]]. The Commissioner argues that Dr. Telford-Tyler's opinions therefore do not conflict with the RFC. [Doc. 16 at 11-12]. Additionally, the Commissioner asserts that the ALJ did consider the potential for episodic interruptions to a normal workweek when he limited

46

Plaintiff to work that did not involve "fast-paced production work" and suggests that the need for initial extra supervision was negated by the limitation to simple work with only occasional contact with coworkers.  [*Id.*].

In reply, Plaintiff points out that the ALJ never stated that he was accommodating the potential for episodic interruptions in the workweek by limiting Plaintiff to work that did not involve "fast-paced production work." [Doc. 19 at 3].  As such, Plaintiff asserts that the Commissioner is "impermissibly engaging in a post-hoc justification of the ALJ's decision."  [*Id.*].

The Court concludes that the ALJ erred in evaluating the opinion of Dr. Telford-Tyler.  First, the Court is unpersuaded by the Commissioner's argument that the limitations relating to episodic interruptions of the workweek and the need for initial extra supervision were incorporated into the ALJ's RFC.  [Doc. 16 at 11-12]. The ALJ said nothing about Plaintiff's limitations regarding interruptions in the work week or the need for initial extra supervision—he did not explain that they were accommodated by the RFC or that he did not credit the limitations.  Moreover, contrary to the Commissioner's assertions, it makes no logical sense that precluding Plaintiff from "fast-paced production work" is a sufficient accommodation for episodic interruptions to a normal work week, and without an explanation of how precluding

47

fast-paced production work would adequately account for episodic interruptions in a normal workweek, the Court declines to make such a substantial inference into the ALJ's reasoning for this aspect of his RFC.

The Commissioner's argument that the ALJ omitted the limitations relating to episodic interruptions of the workweek and the need for initial extra supervision because they were not "substantial limitations" is no more convincing.  Although, as the Commissioner points out, Dr. Telford-Tyler did opine that neither of the omitted limitations was substantial, this argument is not persuasive because Dr. Telford-Tyler found that *all* of the mental RFC limitations were non-substantial, yet without explanation, the ALJ included only *some* of the them in his RFC.  To wit,  by limiting Plaintiff to simple work, limiting his interactions with people, and restricting him from fast-paced production work, the ALJ's RFC mirrored some facets of Dr. Telford-Tyler's findings, such as the determinations that Plaintiff "seems capable of understanding and remembering simple tasks . . . but would have difficulty with detailed tasks," "seems capable of maintaining basic attention, concentration and pace for simple tasks, but would have difficulty with detailed tasks/sustained concentration," and "may have some problems dealing with the public and responding appropriately to co-workers," all of which were limitations that Dr. Telford-Tyler also indicated were

48

not substantial limitations.  [*Compare* R21-22 (ALJ) *with* R336 (Telford-Tyler)].  As a result, it is not enough for the Commissioner to suggest that the ALJ could omit the limitations regarding episodic interruptions and need for initial extra supervision from his RFC simply because Dr. Telford-Tyler determined that they were not substantial limitations, given his adoption of other non-substantial limitations in the RFC.  Thus, these limitations given by Dr. Telford-Tyler should have been evaluated. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (providing that the Commissioner evaluates every medical opinion the Agency receives, regardless of the source); SSR 96-8p ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

Finally, the Court notes that the record supports Dr. Telford-Tyler's opinion that Plaintiff would have episodic interruptions in his ability to complete a normal workweek secondary to his psychological symptoms and that he would require initial extra supervision.  On the psychoeducational evaluation conducted in 2008, it was noted that Plaintiff had thirty-one absences during the prior academic year and six behavioral referrals during one school year, three of which were related to using profanity.  [R159].  The psychoeducational evaluator noted that Plaintiff's "manner of coping with and expressing his feelings is inappropriate and interferes with classroom

functioning, interpersonal relationships, and social-emotional development." [R170]. She further indicated that Plaintiff would need "3 to 5 times as much repetition of content as necessary for the average student." [R171].

Additionally, Dr. Koontz, another state-agency reviewing psychologist, opined that although they were not substantial limitations, Plaintiff's attention-seeking and avoidance were likely to result in attendance problems and difficulties with supervisors, he would have difficulty sustaining concentration for unfamiliar tasks, and Plaintiff would have some initial difficulty with workplace adaptation. [*Id.*].

Therefore, the Court finds that the ALJ erred when he failed to account for Dr. Telford-Tyler's opinions that Plaintiff's psychological symptoms would cause episodic interference in his ability to complete a normal workweek and that Plaintiff may require some initial extra supervision or to explain why those opinions were not credited. Upon remand, the ALJ must weigh the opinions and either account for them in determining the RFC and the limitations set forth in the hypothetical, or he must explain why the opinions are not indicative of further mental limitations.

### B.   *Credibility Determination*

The ALJ has discretion in making credibility determinations after listening to a claimant's testimony, "[b]ut the ALJ's discretionary power to determine the credibility

50

of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). In evaluating whether a Plaintiff is disabled based on a claimant's testimony regarding his pain or other subjective symptoms, the Eleventh Circuit evaluates whether there is: "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Wilson v. Barnhart*, 284 F.3d 1219,1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223). The ALJ need not cite to the pain standard so long as "his findings and discussion indicate that the standard was applied." *Wilson*, 284 F.3d at 1225-26.

The pain standard "is designed to be a threshold determination made prior to considering the plaintiff's credibility." *Reliford v. Barnhart*, 444 F. Supp. 2d 1182, 1189 n.1 (N.D. Ala. 2006). Thus, "[i]f the pain standard is satisfied, the ALJ must consider the plaintiff's subjective complaints." *James v. Barnhart*, 261 F. Supp. 2d 1368, 1372 (S.D. Ala. 2003). When a claimant's subjective testimony is supported by medical evidence that satisfies the pain standard, he may be found disabled. *Holt*, 921 F.2d at 1223. If the ALJ determines, however, that

51

claimant's testimony is not credible, "the ALJ must show that the claimant's complaints are inconsistent with his testimony and the medical record." *Rease v. Barnhart*, 422 F. Supp. 2d 1334, 1368 (N.D. Ga. 2006) (Feldman, M.J.). This credibility determination does not require the ALJ to cite to particular phrases or formulations, but it also cannot be a broad rejection so as to prevent the courts from determining whether the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1210-11. "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote*, 67 F.3d at 1562.

Plaintiff argues that the ALJ erred in his determination of Plaintiff's credibility as to his back problems and mental impairments. [*See* Doc. 13 at 17-24]. The Court addresses the ALJ consideration of each of the impairments below.

### 1.    *Back Problems*

Plaintiff first argues that the ALJ did not properly evaluate the credibility of his testimony regarding the symptoms and limitations arising from his back problems. [Doc. 13 at 18-19]. He points out that he testified that his back pain causes him to take a long time to get out of bed; a doctor told him that because he was of "legal age," he could not have back surgery performed; he can sit for only about twenty minutes before he need to stand up; he can stand for only about twenty-five to thirty minutes; and he

AO 72A
(Rev.8/8
2)

can bend, "but it will hurt coming back up," [*id*. at 11 [citing R373, 375]], which, he suggests, indicates greater limitations that those found in the RFC, [*see* Doc. 13 at 18-19]. Specifically, Plaintiff alleges that when crafting the RFC, the ALJ (1) did not take Plaintiff's severe impairments of lumbar lordosis and thoracic kyphosis into account and (2) improperly rendered his own medical opinion by describing Dr. Ayeni's physical examination findings as "within normal limits," despite Dr. Ayeni's note two days before the non-disability finding that Plaintiff complained that pain in his upper and middle back was "aggravated by physical activity and prolonged standing," found "point tenderness in T7, T8[,] and T9[,]" found that Plaintiff had a "hump in [his] upper back," and diagnosed Plaintiff with "marked kyphosis of the spine." [Doc. 13 at 18-19; *see also* R22, 292].

Additionally, Plaintiff argues that his allegations of physical symptoms and limitations are supported by the medical evidence of record. [Doc. 13 at 19-20]. Plaintiff asserts that he was diagnosed with kyphosis and scoliosis by both his physician at Kids Avenue Pediatrics and Dr. Berry. [*Id*. at 20; *see also* R301, 309]. Plaintiff further indicates that "Dr. Chandora found that Plaintiff was 'unable to sit' and diagnosed him as suffering from, *inter alia*, scoliosis." [Doc. 13 at 20; *see also* R355]. Plaintiff also contends that his own testimony supports his alleged symptoms and

53

limitations and establishes that he is limited in his ability to function due to his back impairments.  [Doc. 13 at 20].

The Commissioner, in response, argues that the ALJ's characterization of Dr. Ayeni's medical findings as "within normal limits" was appropriate and was adequate explanation as to why he found that Plaintiff's alleged symptoms and limitations arising from his back problems were not credible.  [Doc. 16 at 15].  The Commissioner asserts that Dr. Ayeni's examination revealed "minimal objective findings":  although Plaintiff had "thoracic tenderness and a hump in his back," his chest was symmetrical; he had "normal flexion, extension, and straight leg raising"; "examination of the joints and extremities was normal"; and he "had a normal, steady gait with no limp."  [Doc. 16 at 15; *see also* R290-92].  The Commissioner also argues that Dr. Ayeni's diagnosis of marked kyphosis of the spine, standing alone, does not establish the severity of any work limitations related to his back.  [Doc. 16 at 16 (relying on *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) (per curiam) (noting that the existence of an impairment does not reveal the extent to which it limits the claimant's ability to work); *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1988) (same))].  The Commissioner further contends that Plaintiff has failed to establish sufficient reason to refute the ALJ's determination that Plaintiff is capable

54

of light work, considering Dr. Ayeni's minimal medical findings and Dr. Berry's assessment that Plaintiff's thoracic kyphosis was "mildly symptomatic" and should be treated with Motrin. [Doc. 16 at 16; *see also* R309].

Plaintiff, in reply, asserts that because he has testified that "physical activity and prolonged standing" elicit back pain and that after waking in the morning, he must lay in bed for three more hours due to back pain, he has shown that his kyphosis limits his ability to stand and walk. [Doc. 19 at 4 [citing R290, 373]]. He then contends that because light work may require "a good deal of walking or standing," the kyphosis therefore prevents him from undertaking light work. [Doc. 19 at 4 (citing 20 C.F.R. § 416.967(b))].

In his decision, the ALJ noted Plaintiff's claims that he could not sit for longer than twenty minutes without needing to change position, could not stand for longer than about thirty minutes, and was unable to lift any objects heavier than twenty pounds, but found that Plaintiff's complaints of pain and limitations arising from his back problems were not fully credible because they were unsupported by the medical evidence. [R19, 22]. The ALJ observed that in December 2007, Plaintiff had been seen by Dr. Berry, an orthopedist, for an evaluation of the hump in his back, and that Dr. Berry discovered thoracic kyphosis with lumbar lordosis and moderate rotatory deformity, but also found

55

that Plaintiff's leg lengths were equal.  [R18-19].  The ALJ further noted that Dr. Berry recommended no treatment except for use of over-the-counter pain medication as needed.  [R19].  The ALJ also observed that when Plaintiff was examined by Dr. Ayeni in April 2009, Dr. Ayeni's findings were within normal limits, and the ALJ specifically referenced Dr. Ayeni's findings that Plaintiff's gait was normal and a straight-leg test was negative.  [R20, 22].

The Court finds no reversible error in the ALJ's consideration of Plaintiff's complaints of back pain.  Contrary to Plaintiff's arguments, the most cursory review of the ALJ's decision reveals that he expressly considered Dr. Berry's diagnosis of thoracic kyphosis with lumbar lordosis and Dr. Ayeni's April 2009 medical notes, [*see* R18-20, 22], and as the Commissioner aptly points out, a diagnosis alone is not sufficient to establish the severity of a medical condition, but rather, there must be objective medical evidence to confirm the severity, *see McCruter*, 791 F.2d at 1547.

Moreover, the physicians' medical notes provide substantial evidentiary support for the ALJ's determination that Plaintiff was capable of performing the limited range of light work set forth in the RFC.  In December 2007, Dr. Berry found a "moderate amount of rotatory deformity" and equal leg length and opined that "[n]o treatment is indicated," [R310], and in July 2009, Dr. Berry found that Plaintiff's thoracic scoliosis

56

was "mildly symptomatic" and recommended using Motrin for symptomatic treatment, [R309-10].  And although in April 2009 Dr. Ayeni diagnosed "marked" kyphosis of the spine, noted point tenderness at T7-T9, and observed diminished sensation to fine touch in L4 and L5, the examination indicated no significant limitations: Plaintiff's chest was symmetrical, he had full strength in all extremities, straight-leg raising was normal, he had no swelling, he had a normal gait without a limp, his joints were normal, and he was able to get on and off the examination table without difficulty.  [R291-92].

The additional medical evidence cited by Plaintiff does not suggest limitations more severe than those accommodated by the ALJ's RFC determination.  The Kids Avenue record from July 1, 2009, recommends follow-up with Dr. Berry for further evaluation of the initial spinal diagnoses, which then led to Dr. Berry's determination that Plaintiff had only "mildly symptomatic" thoracic scoliosis.  [*See* R301, 309]. Dr. Chandora's scoliosis diagnosis and finding that he was "unable to sit" is also of little use here because Dr. Chandora was Plaintiff's psychiatrist, there is no indication that Dr. Chandora conducted a physical examination, and review of the record reveals that Plaintiff in fact made no medical complaints and that the entire comment by Dr. Chandora was listed in the *behavioral* assessment as "restless[,] unable to sit without fidgeting," [R355].  Thus, there is no reason to credit Dr. Chandora's notes as

57

disclosing a disabling spinal problem. *Cf. Mulholland v. Astrue*, No. 1:06-CV-2913-AJB, 2008 WL 687326, at *12 (N.D. Ga. Mar. 11, 2008) (Baverman, M.J.) (noting that a doctor making a physical examination should not be expected to diagnose a mental problem); *Elbert v. Barnhart*, 335 F. Supp. 2d 892, 912 (E.D. Wis. 2004) ("[T]here is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression. He is not looking for it, and may not even be competent to diagnose it.").

For all of these reasons, the Court finds that the ALJ considered the medical condition of Plaintiff's back as a whole and provided adequate reasons for rejecting Plaintiff's allegations of severe back pain. Thus, Plaintiff has failed to show that upon remand the ALJ need further consider the credibility of his allegations of back pain.

### 2.    *Mental Impairments*

Plaintiff also takes issue with the ALJ's evaluation of Plaintiff's allegations of limitations arising from his mental impairments. [Doc. 13 at 20-24]. First, Plaintiff contends that the ALJ erred by relying on Plaintiff's lack of specialized treatment for his mental impairments without considering that his poverty and lack of insurance may have prevented him from receiving care. [*Id*. at 20-21 [citing R38 (Ms. Hazard's May 2010 statement that she could not afford Plaintiff's medication and Plaintiff had

58

not been to a doctor since 2008 because he had no insurance)]].  Second, Plaintiff argues that reliance on his lack of specialized treatment for his mental impairments is also improper because it is unreasonable to penalize a person with mental impairments for the exercise of poor judgment in seeking treatment.  [Doc. 13 at 21 (citing *Mulholland*, 2008 WL 687326 at *13)].  Third, Plaintiff asserts that the ALJ misstated the record when he noted, "At [Plaintiff's] March 2011 visit, affect, mood, thought process, and behavior were all found to be unremarkable," despite Dr. Chandora's treatment notes indicating that Dr. Chandora in fact observed a guarded affect and down mood, assigned a GAF score of 30, and diagnosed bipolar disorder. [Doc. 13 at 22-23 [citing R22, 353]].  Fourth, Plaintiff argues that it is not clear that the ALJ considered the treatment notes from Clayton Center from November 2010 because the notes indicate that Plaintiff suffered from disabling mental limitations:  Plaintiff was noted to have "guarded and dependent behavior, flat affect, [and a] sad mood" during his evaluation on November 22, 2010, [R350]; Plaintiff was diagnosed with major depressive disorder and attention deficit on November 22, 2010, [R341]; and Dr. Chandora noted fidgetiness, diagnosed major depression, and assigned a GAF score of 30 during Plaintiff's November 30, 2010, evaluation, [R355].  [Doc. 13 at 23-24].

The Commissioner, in response, contends that the ALJ did not err in his basing

59

his credibility determination on Plaintiff's lack of mental-health treatment because the evidence shows that Plaintiff had access to—and used—free or low-cost medical providers.  [Doc. 16 at 16-17 [citing R338-58 (Clayton Center mental-health treatment records dated Nov. 2010-Mar. 2011); R354 (Clayton Center nurse's note of having provided Plaintiff a list of free and low-cost sources for seizure medication); R373 (Plaintiff's testimony that he obtained sleep medication from a free clinic)]].  The Commissioner then asserts that the ALJ properly assessed the evidence and Plaintiff's credibility and that the Court should give the ALJ's credibility finding the " 'special deference' it is due."  [Doc. 16 at 17 (quoting *Parker v. Bowen*, 788 F.2d 1512, 1521 (11th Cir. 1986)))].

Plaintiff replies that the Commissioner is impermissibly providing a post-hoc justification because the ALJ did not state that he was rejecting Plaintiff's testimony due to his failure to obtain free or low-cost medical treatment.  [Doc. 19 at 5].  He also reiterates his contention that because he has mental impairments, it was improper to fault him for his delay in seeking care.  [*Id*.].

The Court concludes that the ALJ erred in his credibility assessment regarding Plaintiff's claimed mental impairments.  First, because the Court already found above that the ALJ erred in failing to consider the GAF scores of 30 that Dr. Chandora

60

assigned on November 30, 2010, and March 24, 2011, it is axiomatic that the ALJ also failed to take what appears likely to constitute favorable medical evidence into consideration when evaluating the credibility of Plaintiff's allegations regarding his mental health.  Likewise, the ALJ's reevaluation of Dr. Telford-Tyler's findings as to Plaintiff's mental limitations may also lead to a determination that the medical evidence is more supportive of Plaintiff's allegations of mental limitations than it first appeared. Additionally, as Plaintiff ably points out, given Dr. Chandora's March 24, 2011, treatment notes indicating that Dr. Chandora observed a guarded affect and down mood, assigned a GAF score of 30, and diagnosed bipolar disorder, it is clear that the ALJ misapprehended the record when he noted that at Plaintiff's March 2011 visit, "affect, mood, thought process, and behavior were all found to be unremarkable." [*Compare* R22 *with* R353].

Second, although the evidence indicates that Plaintiff and his guardian were aware of significant mental health issues since Plaintiff's childhood, [*see, e.g.,* R159-60 (school notes indicating major emotional and behavioral issues and observing that "withdrawal, anxiety, and depression were believed to . . . impede [Plaintiff's] academic progress"); R239 (May 2008 referral to a psychiatrist); R350 (noting ADHD diagnosis at age six)], and, thus, *Mulholland*'s forgiveness for failure to recognize the

need for treatment does not apply, it is not clear that the ALJ considered the full impact of Plaintiff's mental impairments and poverty on his ability to procure care.  As the Commissioner states, the ALJ's decision does show that he took into account evidence that free and low-cost resources were available to address at least some of Plaintiff's impairments at least some of the time.  [*See* R19].  However, the evidence also indicates that Plaintiff's poverty and disabilities may have prevented him from accessing even free or low-cost care:  Plaintiff testified that he had never had a driver's license because he could not pass the written portion of the driving test, [R371], and Plaintiff's guardian testified that she had to provide all transportation for Plaintiff because he is unable to use public transportation; for a time, she and Plaintiff lived with a relative far across town from Plaintiff's medical providers; and Plaintiff had missed several medical appointments because she was unable to transport him to the appointments, [R384-85].  Additionally, the evidence indicates that after Plaintiff's SSI was withdrawn, Plaintiff and his guardian lived on her disability income of $718 per month, and thus, it is unclear whether Plaintiff could afford even low-cost care.  [*See* R38, 139].  It does not appear that the ALJ considered these issues in faulting Plaintiff for missing appointments, failing to seek more regular treatment, or failing to comply with treatment recommendations and prescriptions.  [*See* R19].

62

For all of these reasons, the Court concludes that the ALJ's decision does not indicate that he considered the record as a whole in determining the credibility of Plaintiff's allegations as to the limitations arising from his mental impairments.

## C.   *Vocational Testimony*

Plaintiff's argument that the vocational testimony cannot provide substantial evidence to support the denial is predicated on his allegations that his mental and physical impairments imposed limitations greater than those included in the RFC and the hypothetical posed to the VE.  [Doc. 13 at 24-25].  Should the RFC or hypothetical question change upon the ALJ's reconsideration of the medical evidence and Plaintiff's allegations as to the limitations arising from his mental impairments, the ALJ should also consider whether additional VE testimony is needed.  *See Winschel v. Comm'r. of Soc. Sec.*, 631 F.3d 1176, 1181 (11th Cir. 2011) (finding that "[b]ecause the ALJ asked the [vocational expert] a hypothetical question that failed to include or otherwise implicitly account for all of [the claimant's] impairments, the vocational expert's testimony is not 'substantial evidence' and cannot support the ALJ's conclusion"); *see also Wilson*, 284 F.3d at 1227 (holding that "the ALJ must pose a hypothetical question which comprises all of the claimant's impairments").

63

## VIII.  CONCLUSION

For the reasons above, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED,** this the 24th day of March, 2014.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

64